IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2020 JAN 17 P 2:27
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| STEVEN JACKSON, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 2:20-CV-0046 |
| ) | |
| KOCH FOODS OF ALABAMA, LLC ) | |
| ) | JURY TRIAL DEMANDED |
| Defendant. ) | |

## COMPLAINT

**COMES NOW** Plaintiff, Steven Jackson, by and through his attorney of record, and for his complaint against Defendant, Koch Foods of Alabama, LLC hereby states as follows:

### NATURE OF THE CASE

1. This is an action for damages, declaratory and injunctive relief to redress deprivation of rights secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.* (hereinafter "Title VII") and 42 U.S.C. § 1981, for retaliation for having complained of unlawful discrimination by Defendant.

### JURISDICTION AND VENUE

2. This action arises under the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e), *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

3. Jurisdiction over this action is conferred on this court by 42 U.S.C. §§ 2000(e), *et seq.* and 42 U.S.C. § 1981.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) since Defendant does business in this district and a substantial part of the conduct giving rise to the claims occurred in this district.

1

## PARTIES

5. Plaintiff, Steven Jackson (hereinafter "Plaintiff" or "Mr. Jackson"), is an individual over the age of 19 and a resident citizen of Elmore County, Alabama.

6. Defendant, Koch Foods of Alabama, LLC ("KFA"), is a corporation that owns and operates facilities at which it processes and packages chicken products ("Montgomery facilities") for sale and ultimately consumption by the public, and conducts this business in Montgomery, Alabama.

7. The KFA complex consists of multiple units, including a Debone Plant, Kill Plant, Hatchery, and Shipping Facility.

## ADMINISTRATIVE PROCEDURES

8. On February 5, 2019, Jackson filed a charge of discrimination with the Equal Opportunity Employment Commission (hereinafter "EEOC"), Charge No. 420-2019-01095 alleging that during the time he worked for Defendant he experienced unlawful retaliation in violation of Title VII and 42 U.S.C. §1981. A copy is attached as Exhibit A.

9. On July 19, 2019, the EEOC issued a Notice of Right to Sue to Mr. Jackson. A copy is attached as Exhibit B.

10. Plaintiff has exhausted all administrative remedies available prior to filing the Complaint.

## STATEMENT OF FACTS

11. In 2009, Mr. Jackson began working for KFA.

12. Mr. Jackson currently works in the Debone Plant at KFA.

13. Mr. Jackson is currently a Wastewater Technician at the KFA Debone Plant.

14. Mr. Jackson is a union steward at the KFA Debone Plant.

15. Mr. Jackson's supervisor is Huey Marshall.

16. The plant manager of the KFA Debone Plant is currently Johnny Gill.

17. During Mr. Jackson's employment with KFA, Melissa McDickinson was the human resources manager ("HR") for the Debone Plant owned and operated by KFA.

18. During Mr. Jackson's employment with KFA, David Birchfield was the complex HR manager at KFA's Montgomery facilities.

19. Birchfield maintained an office at KFA's Kill Plant.

20. The Debone Plant is located across the street from the Kill Plant.

21. McDickinson worked under the direct supervision of Birchfield.

22. McDickinson and Birchfield were engaged in a sexual relationship.

23. Birchfield worked under the direct supervision of Bobby Elrod.

24. Bobby Elrod is employed by Koch Foods.

25. Bobby Elrod is the Director of Human Resources for Koch Foods.

26. Upon becoming HR Manager, McDickinson hired her sister-in-law, Rebecca Milam as Quality Assurance Clerk.

27. Within six months, Milam was promoted to HR Clerk at the Debone Plant.

28. Sometime in 2014, McDickinson sought to befriend Mr. Jackson.

29. Mr. Jackson accepted McDickinson's overtures.

30. McDickinson introduced Mr. Jackson to Milam.

31. Mr. Jackson, Milam, and McDickinson began socializing at work and outside of the workplace.

32. Mr. Jackson and Milam began a consensual sexual relationship.

33. McDickson called Mr. Jackson into the HR office one day to tell him that she suspected Mr. Jackson's coworker, Irish Jenkins, of starting a plant fire.

34. McDickinson indicated to Mr. Jackson that she was sexually attracted to Jenkins and wanted Mr. Jackson to introduce her to Jenkins.

35. McDickinson suggested that she had the power to make the accusations about the plant fire against Jenkins go away.

3

36. Mr. Jackson relayed McDickinson's message to Jenkins.

37. Mr. Jackson and Milam and McDickinson and Jenkins began socializing together outside of work.

38. Jenkins and McDickinson began a consensual sexual relationship.

39. Birchfield became suspicious of Jenkins and Mr. Jackson's relationship with McDickinson.

40. Thereafter, Birchfield suspended Mr. Jackson in August 2015 for 3 days.

41. When Mr. Jackson returned to work, Birchfield threatened Mr. Jackson's job if Mr. Jackson continued to hang out with Jenkins.

42. Birchfield told Mr. Jackson that he was to spend more time at Birchfield's home, which Birchfield shared with McDickinson.

43. Birchfield told Mr. Jackson that Mr. Jackson now "owed him one".

44. Birchfield also told Mr. Jackson that he had the power to hire, fire and promote during this conversation.

45. McDickinson assured Mr. Jackson that his job was safe at KFA as long as he did what she and Birchfield told him to do and did not make her or Birchfield mad.

46. Sometime in the fall of 2015, McDickinson expressed to Mr. Jackson that she was sexually attracted to Ka'Toria Gray, a nurse who worked at KFA.

47. On or about November 2015, Mr. Jackson was at the home of Birchfield and McDickinson.

48. Birchfield and McDickinson invited Gray over to their home on or about November 14, 2015.

49. McDickinson insisted that Gray leave work to come over to McDickinson and Birchfield's home.

50. Gray arrived at Birchfield and McDickinson's home.

51. McDickinson sat next to Gray, rubbed Gray's leg, and attempted to kiss her.

52. McDickson made other sexual advances toward Gray.

53. Birchfield approached Gray from behind and kissed her neck.

54. Birchfield and McDickinson's behavior upset Gray.

4

55. Gray eventually got in her car and went home.

56. Gray later told Mr. Jackson that McDickinson and Birchfield made her feel uncomfortable.

57. Thereafter, McDickinson continued pursuing a sexual relationship with Gray.

58. On or about April 18, 2016, Gray filed a Charge of Discrimination with the EEOC.

59. Birchfield told Mr. Jackson that Gray had filed a complaint with the EEOC and KFA had hired an investigator to investigate the allegations in Gray's charge.

60. Birchfield instructed Mr. Jackson to lie if anyone asked him about the night Gray came to Birchfield and McDickinson's home.

61. Birchfield specifically told Mr. Jackson to say that Birchfield was not present on the night that Gray came to Birchfield and McDickinson's home.

62. Birchfield reminded Mr. Jackson that he owed him.

63. Mr. Jackson, fearing that he would lose his job, told the investigator that Birchfield was not present that night.

64. The statement Mr. Jackson gave was untrue.

65. Mr. Jackson lied in fear of retaliation from Birchfield if he did not fully comply with Birchfield's demands.

66. Immediately following Mr. Jackson's meeting with the investigator, Birchfield called Mr. Jackson to make sure that he had lied as Birchfield instructed.

67. Laura Cortes, HR Generalist for KFA, asked Mr. Jackson to provide a sworn statement about his knowledge of Birchfield and McDickinson's relationship and their actions of discrimination and retaliation against employees.

68. Birchfield suspended Cortes and started building a case to terminate her for job performance.

69. Birchfield terminated Cortes.

70. Birchfield had no reason to terminate Cortes. Birchfield terminated Cortes because she had complained about Birchfield's discriminatory actions at KFA.

71. After Birchfield learned that Mr. Jackson was a witness for Cortes, he started targeting Mr. Jackson like he was doing Cortes.

72. Bobby Cotton ("Cotton") was employed as the plant manager for KFA.

73. Mr. Jackson's supervisor, Huey Marshall ("Marshall"), told him that Cotton and Birchfield were talking to people and trying to create issues to terminate Mr. Jackson, stating that Cotton and Birchfield placed a target on his back.

74. Cotton instructed Mr. Jackson's co-workers to report any issues about Mr. Jackson's job performance.

75. Cotton restricted Mr. Jackson from accessing his office for almost three months.

76. At some point, Mr. Jackson was allowed to return to the office, but within a month, Cotton removed the air conditioner from the room and had the power stripped as well.

77. HR Manager, Sherri Gonzalez falsely accused Mr. Jackson of spending too much time away from his job station.

78. Mr. Jackson believes that Cotton and Gonzalez were acting on Birchfield's behalf.

79. Mr. Jackson believes that Birchfield was retaliating against him using employees Birchfield hired because Mr. Jackson refused to comply with Birchfield's acts of discrimination, and Birchfield thought Mr. Jackson may participate as a witness in pending KFA EEOC investigations.

80. Additionally, in mid-June 2016, Birchfield and Cotton exchanged emails regarding Mr. Jackson's termination while Mr. Jackson was out on FMLA.

81. On June 18, 2016, Sherri Gonzalez, HR Clerk, sent an email to Mr. Jackson's supervisor, Marshall, stating that Mr. Jackson needed to report to HR to sign for points. Birchfield, Cortes, and Milam were copied on the email.

82. On June 18, 2016, Cortes sent an email to Marshall stating, "Demotion for a lead positions 4.5 points."

83. On June 18, 2016, Birchfield forwarded Cortes's email to Cotton stating, "Union steward needs to be addressed".

84. On June 20, 2016, Cotton sent an email stating that Mr. Jackson had 3 unexcused absences, which would result in 7 points and Mr. Jackson's termination.

85. On June 20, 2016, Birchfield emailed Cotton stating, "Steve Jackson just called said that he was out due to FMLA condition both days."

86. Around mid-July 2016, Mr. Jackson met with an assistant at the law office of an attorney who was representing one of his former coworkers in an employment discrimination case against McDickinson, Birchfield, and KFA.

6

87. Mr. Jackson was concerned with everything going on at KFA as well as his job.

88. Mr. Jackson met with the assistant a few times before meeting with the attorney.

89. Mr. Jackson had pictures on his phone of McDickinson and Birchfield.

90. Mr. Jackson eventually turned over two phones to the attorney that contained scantily clad pictures of Birchfield and McDickinson and text communications between himself, McDickinson, and Birchfield.

91. During the first week or two of May 2017, Mr. Jackson spoke with Rebecca Milam who told Mr. Jackson that she had just received a message from McDickinson.

92. The message was to Milam and Mr. Jackson and said, "we'll see you soon" and "what comes around goes around" and "this message is for Steve too."

93. Milam first told Mr. Jackson about the message over the phone, then he met her in person and saw the message on her phone.

94. Milam and Mr. Jackson perceived the text as a threat and continued harassment and retaliation.

95. In mid to late 2016, Mr. Jackson became the Lead Wastewater Technician. As the Lead, he managed and trained workers.

96. In October 2017, Mr. Jackson's supervisor, Marshall, had Mr. Jackson sign a piece of paper saying that Mr. Jackson was going to be an M4 Mechanic and that his pay would increase by $.50 per hour.

97. Mr. Jackson signed the paperwork and his pay increased to about $15.75 per/hour.

98. Shortly thereafter, in November 2017, HR Manager, Lisa Wright warned Mr. Jackson that the maintenance manager, Tim Burke ("Burke"), was about to take away his lead pay.

99. Mr. Jackson then had a meeting with KFA about reducing his pay.

100. Complex Manager Darren Ware ("Ware"), Cody Perry, and Burke were present at the meeting for KFA and Curtis Gray and Marisol Urina were there as union representatives to discuss why Mr. Jackson's pay had been reduced.

101. Burke stated that he already had a lead man (Rodney Rhodes), but Rhodes worked at the Kill Plant and Mr. Jackson worked at the Debone Plant.

102. All other employees receiving lead pay who transferred with Mr. Jackson in maintenance at the Debone Plant retained their lead pay, but Mr. Jackson's lead pay was taken away.

103. Mr. Jackson's pay went from $15.75 per hour to $15.25 per hour despite Mr. Jackson continuing to train workers.

7

104. During the November 2017 meeting about reducing Mr. Jackson's pay, Ware tried to get Mr. Jackson to sign a document stating that he had evidence pertaining to a former coworker, Irish Jenkins, who had taken some type of legal action against KFA.

105. Mr. Jackson did not pay very close attention to the documents, but he knew it had something to do with him agreeing not to destroy evidence.

106. In January 2018, an attorney for McDickinson and Birchfield began filing subpoenas seeking information contained on all the computers and cell phones that Mr. Jackson had used in the past six years in connection with employment discrimination cases filed by two of Mr. Jackson's former coworkers (Harvey Fuller and Ka'Toria Gray) against McDickinson, Birchfield, and KFA.

107. Mr. Jackson retained an attorney because of the subpoena he had received.

108. Mr. Jackson received another subpoena in June 2018, requesting similar information, including all emails, texts, social media messages between Mr. Jackson and 18 individuals dating back to January 2014.

109. Some of the 18 names on the list were not employees of KFA and had nothing to do with any pending litigation involving KFA or former employees of KFA.

110. Mr. Jackson viewed the subpoenas as continued harassment in an effort to prevent him from participating as a witness on behalf of some of his former coworkers who had filed employment discrimination actions against McDickinson, Birchfield, and KFA.

111. Counsel for KFA served Mr. Jackson with a deposition subpoena through Mr. Jackson's counsel on or about August 10, 2018.

112. Mr. Jackson was suspended for a second time by KFA on August 10, 2018.

113. KFA suspended Mr. Jackson from August 10, 2018 through August 19, 2018 without pay for an alleged violation of KFA's lockout/tagout policy.

114. A few days after his second suspension, HR Complex Manager, Nikki Bibb, called Mr. Jackson into a meeting.

115. Michael Carow, HR Regional Director for Koch Foods, was present at the meeting and as soon as Mr. Jackson walked into Bibb's office, Carow questioned Mr. Jackson about his upcoming deposition and if he knew what time to be there.

116. KFA was aware that Mr. Jackson was being represented by counsel at the time of the meeting.

117. Mr. Jackson's second suspension came less than two weeks before Mr. Jackson's scheduled deposition in the case of one of his former coworkers, Harvey Fuller ("Fuller").

118. Mr. Jackson's second suspension on August 10, 2018 came one week after plaintiffs' attorneys in the Fuller case had provided naked and scantily clad photos of McDickinson and Birchfield from Mr. Jackson's cell phone.

119. Mr. Jackson testified in a deposition in the Fuller case on August 23, 2018.

120. Attorneys for KFA have attempted to subpoena communication between Mr. Jackson and plaintiffs' Harvey Fuller, Irish Jenkins, and Ka'Toria Gray's attorneys on multiple occasions.

121. Mr. Jackson testified in a deposition in the Gray case on September 16, 2019.

122. Mr. Jackson's participation in pending litigation against KFA and its former employees is ongoing.

## COUNT I

### Violation of Title VII, 42 U.S.C. §§ 2000(e) *et seq.*, for Retaliation

123. Plaintiff re-alleges and incorporates by reference all allegations contained in each paragraph above as if asserted herein.

124. Plaintiff engaged in protected activity detailed above.

125. Defendants, by and through their agents and employees, retaliated against Plaintiff as a result of his engagement in the protected activity detailed above.

126. These retaliatory actions by Defendant against Plaintiff directly relate to the terms and conditions of Plaintiff's employment with the Defendant and violate Title VII.

127. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation, and damage to his professional reputation, in amounts to be proven at trial.

## COUNT II

### Violation of 42 U.S.C. § 1981, for Retaliation

128. Plaintiff re-alleges and incorporates by reference all allegations contained in each paragraph above as if asserted herein.

129. The Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits discrimination in the making and enforcement of contracts, including but not limited to; all privileges, terms and conditions of the contractual relationship, and the termination of contracts on the basis of race.

130. Plaintiff had an at-will employment contract with Defendant, KFA.

131. Plaintiff engaged in protected activity detailed above.

132. Defendant, by and through their agents and employees, retaliated against Plaintiff as a result of his engagement in the protected activity detailed above.

133. These retaliatory actions by Defendant against Plaintiff directly relate to the terms and conditions of Plaintiff's employment with the Defendant and violate 42 U.S.C. §1981.

134. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation, and damage to his professional reputation, in amounts to be proved at trial.

### PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff prays the Court award him the following relief:

1. Enter a judgment for the Plaintiff as to Defendant's liability and responsibility for Plaintiff's damages;

2. Lost wages, including lost fringe benefits, which resulted from the unlawful discrimination;

3. Compensatory and punitive damages, including mental and emotional distress, back pay

and front pay;

4. Attorney's fees and costs;

5. Award plaintiff such other and further relief as is just and proper; Plaintiff further demands a struck jury to try the issues raised in this matter.

*[signature]*
ASHLEY N. SMITH (SMI312)
Attorney for Plaintiff
**ASB-7096-A56S**

**OF COUNSEL:**

**MILLER SMITH, LLC**
445 Dexter Avenue, Suite 4050
Montgomery, Alabama 36104
Telephone No. (334) 625-6959
Facsimile No. (334) 513-8686
Email: ashley@millersmithllc.com

*[signature]*
ASHLEY N. SMITH (SMI312)

11